VIRGINIA:

## BEFORE THE VIRGINIA STATE BAR DISCIPLINARY BOARD

IN THE MATTER OF                          VSB DOCKET NO. 20-051-117703
MARK EDWARD KELLOGG

## CONSENT TO REVOCATION ORDER

On June 14, 2022, came Mark Edward Kellogg and presented to the Board an Affidavit Declaring Consent to Revocation (hereinafter "Affidavit") of his license to practice law in the courts of this Commonwealth. By tendering his Consent to Revocation at a time when a disciplinary complaint, Investigation or Proceeding is pending, the nature of which is specifically set forth in the attached Affidavit. Respondent acknowledges that the material facts contained in the pending disciplinary complaint, Investigation or Proceeding are true.

The Board having considered the Affidavit, and Bar Counsel having no objection, the Board accepts his Consent to Revocation.

Upon consideration whereof, it is therefore ordered that Mark Edward Kellogg's license to practice law in the courts of this Commonwealth be and the same hereby is revoked, and that the name of Mark Edward Kellogg be stricken from the Roll of Attorneys of this Commonwealth.

It is further ORDERED that The Respondent must comply with the requirements of Part 6, Section IV, Paragraph 13-29 of the Rules of the Supreme Court of Virginia. The Respondent shall forthwith give notice by certified mail of the Revocation of his license to practice law in the Commonwealth of Virginia, to all clients for whom he is currently handling matters and to all opposing Attorneys and presiding Judges in pending litigation. The Respondent shall also make appropriate arrangements for the disposition of matters then in his care in conformity with the wishes of his clients. The Respondent shall give such notice immediately and in no event later than 14 days of the effective date of the Revocation, and make such arrangements as are required herein as soon as is practicable and in no event later than 45 days of the effective date of the Revocation. The Respondent shall also furnish proof to the Clerk of the Disciplinary System of

the Virginia State Bar within 60 days of the effective date of the Revocation or Suspension that such notices have been timely given and such arrangements have been made for the disposition of matters.

It is further ORDERED that if the Respondent is not handling any client matters on the effective date of the Revocation, he shall submit an affidavit to that effect within 60 days of the effective date of the Revocation to the Clerk of the Disciplinary System at the Virginia State Bar. The Board shall decide all issues concerning the adequacy of the notice and arrangements required herein.  The burden of proof shall be on the Respondent to show compliance.

It is further ORDERED that the Clerk of the Disciplinary System shall mail an attested copy of this order by electronic, regular and certified mail, return receipt requested, to the Respondent, Mark Edward Kellogg at his address of record with the Virginia State Bar, being, 11800 Grenadier Ct, Fairfax Station, VA 22039-1105 and a copy sent by electronic mail to Paul D. Georgiadis, Counsel for Respondent, and to Renu M. Brennan, Bar Counsel.

Entered this 15th day of June, 2022
Virginia State Bar Disciplinary Board

**Carolyn V. Grady**
Digitally signed by Carolyn V. Grady
Date: 2022.06.15 11:18:59 -04'00'

By _____
Carolyn V. Grady
Chair

A COPY TESTE
Joanne "Jo" Fronfelter
Clerk of the Disciplinary System
Virginia State Bar

RECEIVED

**Jun 14, 2022**

VIRGINIA STATE BAR
CLERK'S OFFICE

VIRGINIA:

## BEFORE THE VIRGINIA STATE BAR DISCIPLINARY BOARD

IN THE MATTER OF
MARK EDWARD KELLOGG                           VSB Docket No. 20-051-117703

### AFFIDAVIT DECLARING CONSENT TO REVOCATION

I, Mark Edward Kellogg, after being duly sworn, state that:

1.      I was licensed to practice law in the Commonwealth of Virginia on June 15, 1983. I transferred to Retired status effective January 1, 2022.

2.      I submit this Affidavit Declaring Consent to Revocation pursuant to Rule of Court, Part 6, Section IV, Paragraph 13-28.

3.      I freely and voluntarily render this consent to revocation. I am not subject to coercion or duress. I am represented by counsel, and I am fully aware of the implications of consenting to the revocation of my license to practice law in the Commonwealth of Virginia.

4.      I am aware that there is currently pending a complaint and investigation involving allegations of misconduct by me, and I admit the following:

- I have been friends with Robert Machen[1] ("Machen") for decades.

- As set forth in the attached Final Judgment Memorandum Order (the "Final Judgment Order") entered by a three-judge disciplinary panel in Arlington County Circuit Court in the Virginia State Bar's disciplinary case regarding Machen, and as I testified at this hearing, I represented Machen, as Executor of the Estate of Wilma R. Williams ("Williams") beginning in September 2018 and in 2019. Machen personally paid approximately $75,000 of $80,000 in legal fees to my law firm. I was not a partner in the firm which bore my name.

- As further set forth in the Final Judgment Order, at the time that I represented Machen, I knew that Machen drafted three original wills naming himself the executor and residuary beneficiary, and his son the successor executor and contingent beneficiary, of Wilma Williams' substantial estate valued at approximately $1.7 million at the time of her death ("Estate" or "Williams' Estate"). Under the wills, Williams' 12 beneficiaries (family members and one friend) would receive nominal specific bequests ranging from $7,500 to $30,000, for a total of $285,000 for all 12 beneficiaries, with

---

[1] Robert Machen's license was revoked effective February 18, 2022. A copy of the Final Judgment Memorandum Order is attached as Exhibit A and incorporated herein by reference. Machen has appealed the revocation.

1

the majority of Williams' Estate going to Machen as residuary beneficiary.

- At the time I represented Machen, I knew that Machen was a convicted felon.

- I had concerns that Machen's actions in drafting the wills with himself as a beneficiary likely created an impermissible conflict of interest and violated Virginia Rule of Professional Conduct 1.8(c). I understood there was a narrow exception to that conflict rule if Machen had a familial relationship with Ms. Williams, which I did not confirm. I advised Machen of my concerns and urged him to report himself to the Virginia State Bar ("VSB"), but Machen did not do so. I did not withdraw as Machen's counsel or report him to the VSB because I did not feel that I had clear knowledge that misconduct had occurred.

- The three-judge panel found that Machen's drafting of the wills constituted an impermissible conflict of interest.

- I had on-going concerns that the wills Machen drafted, and the will he submitted to probate before hiring me, were not valid or enforceable for a number of reasons.

- As Machen's counsel and at his direction, on or before October 2018, I co-authored a letter with him which the Fairfax Circuit Court found to be part of a plan to induce the beneficiaries into signing a release of any claim they might have against Williams' Estate.

- At Machen's request, I also authored, and he reviewed, the release of any claim the beneficiaries might have against Williams' Estate.

- Critically, the letter I co-authored with Machen and sent to the beneficiaries:

  o was written to persuade the beneficiaries that the Executor Machen was doing them a favor by suggesting that Machen was paying them more than he had to, and before the law required him to, when in fact he was taking the bulk of the Estate and offering the 12 beneficiaries bequests ranging from $7,500 to $30,000 so they would not contest the invalid will;

  o was written to persuade the beneficiaries to execute the release immediately without questioning Machen's administration of the Estate;

  o incorrectly stated to the beneficiaries that the no contest clause was enforceable and that the no contest clause "would disqualify any heir from continuing to have their right to this payment if they contest the Will or complaint [sic] about the administration of the Estate in any way";

  o offered my opinion to the unrepresented beneficiaries that the invalid will was

2

enforceable.  As set forth in the Letter Opinion dated December 16, 2019, issued by the Fairfax Circuit Court in the will contest, attached as Exhibit B and incorporated herein by reference, other than my advice on the no contest clause and its purported effect, my letter conferred a false assurance of independent legal analysis and notified the recipients that Machen did not have to pay out distributions earlier than the one-year anniversary of his qualification.  The purpose of the language was to ensure that the beneficiaries executed the releases.

- The release I drafted, and Machen reviewed, stated:

    I, ------- [name of beneficiary, filled in for each beneficiary]  (hereinafter referred to as the "Estate") do hereby acknowledge that I have reviewed sufficient documentation to be apprised of the net value of my rights in and to the Estate.

    - I did not send the beneficiaries an inventory of the Estate or any information regarding the value of the Estate.

    The release I drafted, and Machen reviewed, further stated:

    Further I do hereby acknowledge that I have confirmed with my own independent legal counsel and that I have concluded that it is my own best interest to accept the sum of $30,000.00 in full settlement of my remaining right, title and interest in and to the Estate.

    - At the time I drafted the release, I did not know if any of the beneficiaries had consulted counsel.

- I did not disclose to the beneficiaries that Machen drafted the will or my concerns about the validity or enforceability of the will, nor did I disclose to the beneficiaries my concerns about his conflict of interest.

- I did not disclose to the beneficiaries any of the facts that were later held to render the will unenforceable.

- I did not tell the beneficiaries that Machen was a convicted felon.

- On October 15, 2018,  after consultation with Machen, I sent the beneficiaries the letter and release.  Machen and I requested that the beneficiaries sign and return the releases by month's end, or within two weeks, to receive their distribution.

- Machen and I intended for the beneficiaries to rely on the representations in the letter. We expected and hoped that all the beneficiaries would execute the releases quickly.

3

- I also talked to two of the beneficiaries after sending them the releases.  One asked whether she had to send the release before I sent her the money she was to receive, and I responded, yes, I have the check here ready to be sent out.  The other beneficiary told me that his home had been wrecked by a hurricane, and he really needed the money.  I told him I had the check but that I needed the release. I stated that if the beneficiary would send me the release, I would send him the check.

- In reliance on the statements and representations in the letter, all beneficiaries but two signed the releases.

- One beneficiary retained counsel who wrote to me to inquire whether Machen wrote the will. Machen did not authorize me as his counsel to answer the question, and I did not do so.

- Machen provided me with what he asserted was a holographic will[2] signed by Williams, under which the beneficiaries would receive less than they would under the probated will.  Relying on Machen, I provided the  holographic will to counsel for the beneficiary.  My intention was for counsel to believe—as I believed at that time, that the will was a valid holographic will signed by Williams. The three-judge panel found Machen forged the holographic will.

- Other than Williams' home, the bulk of her Estate, approximately $1.3 million, was in investment accounts at UBS Financial Services, Inc. (UBS), a personal wealth management firm. From September 2018 to November 2018, on Machen's behalf, I communicated  with UBS in an attempt to arrange for  UBS to transfer the Estate funds from an Estate account into an account for Machen and his wife.

- In December 2018, UBS placed a temporary hold on the Estate account.  In an attempt to get UBS to remove the hold, after Machen and I conferred, I provided counsel for UBS with the purported "holographic" will.

- UBS did not remove the temporary hold.

- In February 2019, UBS filed a petition in Fairfax County Circuit Court based on concerns that Machen financially exploited Williams.  UBS sought to, and eventually did, interplead the Estate funds into Fairfax County Circuit Court.

- Four days after UBS filed its Interpleader Petition, I, on Machen's behalf, filed a complaint against the two UBS account representatives with the Financial Industry Regulation Authority (FINRA). I filed the complaint because I was concerned for Machen that the UBS freeze exposed Machen's assets to risks and prevented Machen from exercising his redemption rights on puts of municipal bonds.

---

[2] See, 64.2-404 of the Code of Virginia.

4

- In February 2019 two beneficiaries contested the will. I continued to provide legal advice to Machen as Executor for a time, even though he retained other counsel for himself personally. The will contest was successful, and Machen was removed as Executor. The court appointed a curator to replace Machen as Executor and finalize the administration of the Estate.

- I did not return property of the Estate to the curator until April 2020 when I returned from being out of state since February 2020. Specifically, prior to my representation, Machen and I went to Williams' house. Williams was then in the hospital. Because I knew that decades earlier Machen had been convicted of a felony, I understood that he was not allowed to possess firearms —physically or constructively. Therefore, I, on Machen's behalf, removed the six or seven guns from Williams' home and stored them in my own gun safe. I did not disclose to the beneficiaries, or anyone, that I took those guns and had them in my possession. In 2020, after the will contest proceedings referenced in the Final Judgment Order, I returned the guns to the curator.

5.      I acknowledge that the material facts asserted above are true.

6.      I submit this Affidavit and consent to the revocation of my license to practice law in the Commonwealth of Virginia because I know that if the disciplinary proceedings based on the said alleged misconduct were brought or prosecuted to a conclusion, I could not successfully defend them.

Executed and dated on ____6/14/2022____.

_____

Mark Edward Kellogg
Respondent

COMMONWEALTH OF VIRGINIA
CITY/COUNTY OF ____Fairfax____, to wit:

The foregoing Affidavit Declaring Consent to Revocation was subscribed and sworn to before me by Mark Edward Kellogg on ____06-14-2022____.

_____

Notary Public

My Commission expires: ____08-31-2025____.

STEVEN SCHINDELHOLZ
Notary Public 364902
Commonwealth of Virginia
My Commission Expires 08/31/2025



VIRGINIA:

## IN THE CIRCUIT COURT OF ARLINGTON COUNTY

**VIRGINIA STATE BAR EX REL**
**FIFTH DISTRICT COMMITTEE, SECTION I**
**VSB Docket No. 19-051-115338**

**Complainant**

v.                                                        **Case No. CL-20-4304**

**ROBERT B. MACHEN**

**Respondent**

## FINAL JUDGMENT MEMORANDUM ORDER

THIS MATTER, originally scheduled to be heard in January 2021 and continued on the request of Respondent Robert B. Machen ("Respondent"), was heard on February 16, 17, and 18, 2022 by a Three-Judge Circuit Court duly impaneled pursuant to Section 54.1-3935 of the Code of Virginia (1950) as amended, consisting of the Honorable Victoria A. B. Willis, Judge of the 15th Judicial Circuit; the Honorable Steven S. Smith, retired Judge of the 31st Judicial Circuit; and the Honorable Douglas L. Fleming, Jr., Judge of the 20th Judicial Circuit and designated Chief Judge ("Chief Judge") of the Three-Judge Circuit Court (collectively "the Court").

Bar Counsel Renu M. Brennan represented the Virginia State Bar ("VSB"). Respondent, having received proper notice of the proceeding, appeared with his counsel, Stephen A. Armstrong.

The Chief Judge swore the court reporter, and each member of the Court verified that he or she had no personal or financial interest that might affect or reasonably be perceived to affect his or her ability to be impartial in this matter.

WHEREUPON a hearing was conducted upon the Rule to Show Cause issued against Respondent. The Rule directed Respondent to appear and to show cause why his license to practice law in the Commonwealth of Virginia should not be suspended, revoked, or otherwise sanctioned by reason of the allegations of ethical misconduct set forth in the Certification issued by a subcommittee of the Fifth District Committee, Section I, of the VSB.

<u>Misconduct Phase</u>

The Court accepted the parties' Stipulations attached as Exhibit 1 of this Order.

Pursuant to the Pre-Hearing Order entered May 7, 2021, and the Rules of the Supreme Court, Part Six, Section IV, Paragraph 13-12.D, the Court admitted VSB Exhibits 1-112 into evidence.   Respondent did not file any exhibits pre-hearing.

Both parties made opening statements.

The Court received the testimony of the following witnesses for the VSB:

Mark Obenshain, Esq.

Dr. Laurie Flint

Ronald Fitzgerald

John Galleher

Mark Machen

Ronald H. McCall

Jennifer Baumgartner, Esq.

Pursuant to the Court's Order entered February 3, 2022, the following out-of-state witnesses testified virtually on behalf of the VSB:

David Harold Williams

2

John Hargett

Melinda Rossano

Leonard "Buddy" Rainey

Mark Kellogg, Esq.

The VSB then rested.  Respondent testified in his case.  Respondent did not call any other witnesses.  Respondent did not file any exhibits prior to the hearing.  At the hearing, the Court admitted Respondent's Exhibit A, page 82 of the trial transcript of "Williams vs. Machen trial day four" into evidence.

Both parties made closing statements.

Upon due deliberation and consideration of the parties' Stipulations, exhibits, and witness testimony, the Court made the following findings of fact by clear and convincing evidence:

1.    Respondent was admitted to the VSB in 1980.  At all relevant times, Respondent was a member of the VSB.  Stipulations ¶¶ 1-2; VSB Exhs. 2, 3, 4, 11, 111.

2.    Beginning in the 1980s, and for many years, Respondent represented Wilma R. Williams ("Williams") in legal matters.  Respondent was not related to Williams. Stipulations ¶¶ 4-6; VSB Exh. 2.

3.    As set forth, from July 2018 through will contest proceedings which terminated in January 2020, Respondent engaged in a fraudulent scheme to seize control of Williams's assets and Estate, including:

- filing an altered Power of Attorney (Stipulations ¶¶ 7-9, 17-19; Exhs.1, 2, 6 to Stipulations; VSB Exhs. 2, 7-11, 13, 68, 112; Testimony of Mark Machen and Ronald Fitzgerald),

- drafting wills naming himself the primary beneficiary of Williams's substantial Estate and his son the contingent beneficiary (Stipulations ¶¶ 4-6, 17, 20-27; Exhs. 3-6 to Stipulations; VSB Exhs. 2, 4, 5, 11, 15-17, 20, 68, 112; Testimony of Mark Machen),

3

- procuring and attempting to probate wills which he either forged, and/or which were not properly executed, and/or if executed by Williams, were executed when Williams was not competent (Stipulations ¶¶ 4-6, 17, 20-27, 30, 34, 36, 37; Exhs. 3-6 to Stipulations; VSB Exhs. 2, 5, 11, 12, 15-23, 68; 79-82; 112; Testimony of Dr. Laurie A. Flint), and

- persuading or coercing the other beneficiaries to accept small bequests and release any claims against Respondent or the Estate (Stipulations ¶¶ 29-32, 38; Exh. 6 to Stipulations; VSB Exhs. 11, 24, 26-37, 68, 72-78, 110, 112; Testimony of David Harold Williams, Melinda Rossano, Leonard Rainey, Dr. Laurie A. Flint, Mark Kellogg, Mark Obenshain, and John Hargett).

## POWER OF ATTORNEY

4.  On October 25, 2016, Respondent prepared a Power of Attorney (POA) appointing him and his son, Mark Robert Machen, as Williams's attorneys-in-fact in the event Williams became incapacitated or unable to conduct her affairs. Stipulations ¶ 7; Exh. 1 to Stipulations; VSB Exhs. 2, 7, 11, 68, 112.

5.  Dr. Laurie A. Flint, Williams's neighbor and daughter of a long-time friend of Williams, held a medical power of attorney for Williams. On October 25, 2016, Dr. Flint met Respondent, and she witnessed Williams's execution of the POA. Stipulations ¶¶ 7, 10; VSB Exhs. 2, 12, 112; Testimony of Dr. Laurie A. Flint.

6.  According to Respondent, on September 13, 2017, Williams crossed out Mark R. Machen's name after Mark Machen changed jobs and advised Williams that he could no longer serve as her attorney-in-fact under the POA. Per Respondent, Williams initialed and dated the strikeout. Stipulations ¶ 8; VSB Exhs. 2, 11, 112.

7.  In fact, Mark Machen never agreed to serve as attorney-in-fact under the POA, and only learned about the POA on July 31, 2018, at which time he resigned as attorney-in-fact. Mark Machen did not have any conversations with Williams about the POA in 2017 nor did he advise her that he could no longer serve as POA. Mark Machen did not change jobs in 2017. Stipulations ¶¶ 8-9; VSB Exhs. 2, 9-11, 112; Testimony of Mark Machen.

8.  On July 5, 2018, Williams, then 93-years old, fell and suffered a stroke. Williams called Dr. Flint for assistance. Unable to find the house key, Dr. Flint contacted EMS, which transported Williams to INOVA Fairfax. Stipulations ¶¶ 11-14; VSB Exhs. 2, 12, 112; Testimony of Dr. Laurie A. Flint.

9.  On July 6, 2018, Dr. Flint and Respondent went to Williams's house and found the house key. Respondent took possession of the key to Williams's house. Stipulations ¶ 17; VSB Exhs 12, 112; Testimony of Dr. Laurie A. Flint.

10.     In July 2018, Dr. Flint picked up Williams's mail and delivered it to Williams while Respondent was in Williams's hospital room. Williams set aside an unopened envelope from UBS. Respondent repeatedly requested that Williams show him the UBS mail, which contained her June statement. Williams did not want to give the statement to Respondent. After repeated requests, Respondent obtained the UBS statement and learned that Williams had more than $1 million in her UBS accounts. Respondent told the VSB investigator that at that point he thought, "oh my God, she has a lot of money." Respondent took Williams's June 2018 UBS statement. Stipulations ¶ 17; VSB Exhs. 11, 12, 112; Testimony of Dr. Laurie A. Flint.

11.     On July 11, 2018, Williams was transferred to The Fairfax Skilled Nursing Facility, a nursing home, for rehabilitation. Stipulations ¶ 15; VSB Exh. 2.

12.     Dr. Flint recalls at least two conversations, one between July 15 and July 22, 2018, and one between July 20 and 27, 2018, in which Williams told Dr. Flint to keep an eye on Respondent. Dr. Flint inquired of Williams what she meant, to which Williams responded, "just keep your eye on him." VSB Exhs. 12, 112; Testimony of Dr. Laurie A. Flint.

13.     Dr. Flint heard Respondent repeatedly saying to Williams that Williams needed a will and that she would not be able to return home and that it was not safe. Dr. Flint believed Respondent was attempting to manipulate Williams. VSB Exhs. 12, 112; Testimony of Dr. Laurie A. Flint.

14.     Williams's financial advisor for almost 35 years and friend, Ron Fitzgerald, also visited Williams multiple times during her stay at The Fairfax. Dr. Flint saw and spoke with Fitzgerald weekly about Williams's medical progress. Both Dr. Flint and Fitzgerald were concerned about Respondent's actions toward Williams. VSB Exhs. 12, 13, 112; Testimony of Dr. Laurie A. Flint and Ronald Fitzgerald.

15.     Fitzgerald mentioned to Williams that Respondent had taken the June 2018 UBS financial statement. Williams was concerned that Respondent had taken the mail and that Respondent was forwarding the mail from the post office to himself. VSB Exh. 13, 112; Testimony of Ronald Fitzgerald.

16.     Williams told Fitzgerald that she did not trust Respondent with her investment account and to keep an eye on the account. VSB Exh. 13, 112; Testimony of Ronald Fitzgerald.

17.     Throughout July 2018, Williams noticeably and significantly declined. By the end of July 2018, Williams was confined to a wheelchair, and she had to use a hearing enhancement device that resembled large headphones. By the end of July 2018, Williams lacked the testamentary capacity to understand the extent of her assets, her relationships with the beneficiaries, and the consequences and significance of the

documents confronting her. Williams died on August 10, 2018. VSB Exhs. 12, 13, 68, 112; Testimony of Dr. Laurie A. Flint and Ronald Fitzgerald.

18.     Sometime prior to July 26, 2018, Respondent altered the POA, striking the language "to act upon my being incapacitated or unable to logically and reasonably competent to be able" so that Respondent could immediately access Williams's UBS accounts and sell her house and do so whether or not Williams was incapacitated. Stipulations ¶¶ 18, 19; Exhs. 1-2 to Stipulations; VSB Exhs. 7, 8, 11, 68, 112.

19.     On July 26, 2018, Respondent recorded the altered POA in Fairfax County land records. The altered POA did not contain the September 2017 strikeout of Mark Machen as Williams's attorney-in-fact. Stipulations ¶¶ 18, 19; Exhs. 1-2 to Stipulations; VSB Exhs. 7, 8, 11, 68, 112.

20.     Legal proceedings ensued in the Circuit Court for Fairfax County[1]. During the trial, when asked if he altered a witnessed and notarized document and filed it as an original, referring to the POA, Respondent testified, "That's obviously what I did." VSB Exhs. 11, 112.

21.     In its Letter Opinion the Fairfax Circuit Court found that Respondent recorded a false POA in July 2018:

> to be able to represent to Ron Fitzgerald that he had a power of attorney which would entitle him to obtain copies of Ms. Williams UBS statements. His taking the statements home and from which he discovered to his surprise that this elderly widow whose only asset appear to be a home in Fairfax (which was itself valuable) was actually a millionaire.
>
> The recorded power of attorney was a false document because it was the same 2016 Power of Attorney that Wilma Williams in September of 2017 had written to note the resignation of Mark Machen, the son of Robert Machen, as alternative agent under the Power of Attorney. The 2018 recorded Power of Attorney did not have the strike-out and moreover, it contained an additional strike out of the provision that would have made the Power of Attorney only upon Ms. Williams' incapacity… The Court has no doubts that Wilma Williams did not strike out that sentence that removed the condition of her being incapacitated or initial the strikeouts in the recorded Power of Attorney, allowing Mr. Machen to act under the Power of attorney.
>
> With the 2016 Power of Attorney so manipulated, Bob Machen placed himself in a position to exercise control of Ms. Williams UBS Account and all other assets.
>
> Stipulations Exh. 6; VSB Exh. 68, p. 6.

---

[1] See ¶¶ 56-72 below.

## <u>2018 LAST WILL AND TESTAMENT PREPARED AND SUBMITTED TO PROBATE BY RESPONDENT</u>

22.     Respondent prepared, and asserts that on July 31, 2018, he had Williams execute, three copies of the same document which created three original wills. One of the three wills was signed twice; another was signed "Wilma Wilma Williams"; and the third was submitted for probate August 17, 2018 ("Probated Will"). Stipulations ¶¶ 20-27; Exhs. 3-6 to Stipulations; VSB Exhs. 2, 4, 5, 11, 15-17, 20, 68, 112.

23.     As of July 31, 2018, Williams lacked testamentary capacity. VSB Exhs. 12, 68; Testimony of Dr. Laurie A. Flint. See also VSB Exhs. 79-82, Williams was vulnerable to financial exploitation and undue influence.

24.     Williams's Estate had assets in excess of $1.7 million. Stipulations ¶ 29; VSB Exhs. 2, 95-98.

25.     In the Probated Will, Respondent named himself the Executor and primary beneficiary of Williams's Estate. Respondent was to receive all Williams's real and personal property not specifically bequeathed to her nieces and nephews. The nieces and nephews were to receive three payments of $10,000 each, if funds were available, and Laurie Flint was to receive three payments of $15,000 if funds were available. ("Thereafter, any funds remaining in my investment account after a full third payment is made, the investment account shall be distributed as personal property coupled with the real property that shall be inherited by my Executor Robert B. Machen or the successor executor named in this Will.") Stipulations ¶¶ 20-27; Exhs. 3-6 to Stipulations; VSB Exhs. 2, 4, 5, 11, 15-17, 20, 68, 112.

26.     Respondent was not related to Williams, nor was he an heir at law. Stipulations ¶ 6; VSB Exhs. 2, 11.

27.     Without Williams's knowledge or approval, Respondent named his son, Mark Machen, as successor Executor and a contingent beneficiary if Respondent did not survive Williams. Respondent did not tell Mark that he had named him as successor Executor or a contingent beneficiary. Stipulations ¶ 20, 23, 26; Exhs. 3-6 to Stipulations; VSB Exhs. 2, 10, 11, 15-17, 112; Testimony of Mark Machen.

28.     Respondent included a no-contest or *in terrorem* clause to prevent any challenges to the Probated Will. Stipulations ¶¶ 20-24, 27; Exhs. 3-6 to Stipulations; VSB Exhs. 2, 11, 15-17.

29.     Respondent falsely represented that he had Williams sign the Probated Will, as well as the other two purported original wills on July 31, 2018. Stipulations Exh. 6; VSB Exhs. 11, 12, 15-17, 18, 68.

30.     Toni Foreman, one of two witnesses to the purported execution of the will, testified in her deposition that while she was in a waiting room on July 31, 2018, at The Fairfax,

7

a notary and gentleman purporting to be Williams's son requested that Foreman witness a signature on a document.  VSB Exhs. 2, 18, 68.

31.   Foreman further testified as follows:

- Foreman was taken to Williams's room where she stayed for approximately 15 minutes.
- The notary and gentleman who requested that Foreman witness a signature did not tell her what they wanted her to sign or witness.
- Foreman did not know what she was signing or witnessing.
- Foreman was only provided with three copies of page 3 of the document that she signed.  Page 3 only had two lines for witness signatures and the notary stamp.
- Other than the notary's signature and stamp, there were no other signatures, including that of Williams, on the document when the document was presented to Foreman for signature.
- Foreman did not witness Williams sign anything on July 31, 2018.

VSB Exhs. 2, 18, 68.

32.   William Bournes, the second witness, "was afflicted as a self-described lifelong friend of Mr. Machen."  VSB Exh. 68, p. 5; Exh. 6, p. 5 to Stipulations.

33.   The Fairfax Circuit Court noted in its Letter Opinion:

Ultimately, the silent witnesses – the circumstantial evidence of undue influence and fraud that did not need to explain themselves, left the Court with the unshakeable conclusion the 2018 documents were not signed by Wilma Williams or if she had affixed her scribbled signatures that she lacked the testamentary capacity to understand the extent of her assets, the scope of her affections and the consequences of the documents presented to her.

VSB Exh. 68, p. 5;  Exh. 6, p. 5 to Stipulations.

34.   As stated, on July 31, 2018, Mark Machen first learned about the POA, at which time he resigned as attorney-in-fact.  Stipulations ¶ 9; VSB Exhs. 9-11; Testimony of Mark Machen.

35.   On August 10, 2018, Williams died. Stipulations ¶ 28; VSB Exhs. 2, 20.

36.   As of August 10, 2018, Williams's UBS accounts were valued at more than $1.3 million. Stipulations ¶ 29; VSB Exhs. 2, 95-98.

37.   On August 17, 2018, Respondent qualified as the Executor of Williams's Estate and admitted the Probated Will to probate. Stipulations ¶ 30; VSB Exhs. 2, 20.

38. On August 30, 2018, Respondent opened an account at UBS for Williams's Estate ("UBS Estate Account"). VSB Exhs. 2, 13, 47-50; Testimony of Ronald Fitzgerald and John Galleher.

## ATTEMPTS TO SECURE RELEASES FROM BENEFICIARIES

39. In September 2018, Respondent hired his friend of many years, Mark Kellogg, to act as counsel for the Estate. Stipulations ¶ 31; VSB Exhs. 2, 11, 24, 51, 72-73; Testimony of Mark Kellogg.

40. On September 7, 2018, Respondent caused the UBS Estate Account to issue a check for $35,000 payable to the Estate. VSB Exhs. 2, 11, 61, 72-73; Testimony of John Galleher.

41. In October 2018, Respondent and Kellogg exchanged drafts of a letter to be sent to the heirs under Williams's Will to obtain releases in exchange for early distributions. Stipulations ¶ 32; VSB Exhs. 2, 11, 26, 27, 72, 73; Testimony of Mark Kellogg.

42. By letters dated October 15, 2018, to all the beneficiaries except Respondent and his son, Kellogg, on Respondent's behalf, sought releases in exchange for either $30,000 or $45,000 (in the case of Dr. Flint). The letters stated as follows:

> I have been engaged by Robert Machen in his capacity as Executor of the Estate of Wilma Williams (Hereinafter referred to as "The Executor", "The Estate" and "The Decedent" respectively). He has approached me wanting to obey The Decedent's expressed wish that the specific bequests of $10,000 per designated heir be paid out as soon as possible. Further we have determined that there are sufficient assets for the second and third groupings of these bequests to also be paid. Therefore each child of Charles L. Williams is due $30,000 under the Will. The share of the deceased child is to be divided among their four children.
>
> I have advised him that he has no affirmative duty to pay these bequests before the first anniversary date of his appointment and that the Will also includes a clause, that should be fully enforceable, that would disqualify any heir from continuing to have their right to this payment if they contest the Will or complaint [sic] about the administration of The Estate in any way. But he was told by The Decedent that the named heirs are getting along in years and that she wanted them to get the money early so that they could enjoy it.
>
> Attached you will find a "Release and Receipt" that indicates both that you will not take any further action with respect to The Estate and will accept immediate payment of your $30,000. If we get back all of these signed before the end of this month, The Executor will undertake [sic] either mail you an estate check overnight or with a deposit slip furnished by you, deposit it into a bank account that has an Arlington or Fairfax County, Virginia branch.

Thank you in advance for your kind consideration in assisting us in this matter. Do not hesitate to contact me or have your counsel contact me with questions, comments or complaints.

Stipulations ¶ 32; VSB Exhs. 2, 28, 29, 31, 72-78; Testimony of Mark Obenshain, Mark Kellogg, David Harold Williams, Melinda Rossano, Leonard Rainey, and Dr. Laurie A. Flint.

The Final Release and Receipt to the beneficiaries provided that each confirmed with his/her independent legal counsel that it was in his/her "own best interest to accept the sum of $30,000.00 in full settlement of my remaining right, title and interest in and to the Estate." VSB Exhs. 2, 28, 29, 31, 36, 72-78; Testimony of Mark Obenshain, Mark Kellogg, David Harold Williams, Melinda Rossano, Leonard Rainey, and Dr. Laurie A. Flint.

43.   On October 17, 2018, Respondent caused the UBS Estate Account to issue a check for $350,000 payable to the Estate.  VSB Exhs. 2, 51, 61; Testimony of Mark Kellogg and John Galleher.

44.   Respondent transferred a total of $385,000 from the UBS Estate Account. Respondent deposited the funds into an Estate account at the Armed Forces Bank. VSB Exhs. 2, 61; Testimony of Mark Kellogg and John Galleher.

45.   By emails dated October 26, 2018, Kellogg sought Respondent's approval on follow up correspondence to the beneficiaries, quoted below, to which Respondent responded, "Looks ok to me".  Kellogg's email stated as follows (typed verbatim with errors):

The funds to make the full distribution to the heirs due specific amounts of cash are in the bank and cleared for distribution.  We have signed receipts for the following: Nell WillisMereda JonesMichael LewisCharles Williams??? Rosario's????????????Charlene WilliamsAccordingly, their checks are included in their envelopes!As soon as we have the signed releases from the other heirs, I will mail out their checks ( a copy of the check is included in their envelope)...

Stipulations ¶ 32; VSB Exhs. 2, 32; Testimony of Mark Kellogg.

46.   By letter dated November 5, 2018, Kellogg's office sent the following letter to Laurie "Fling[2]":

Several weeks ago we mailed you a Final Release and Receipt for $45,000.00 from the Estate of Wilma Williams.  We have not yet received your signed release back.  We have your check cut (see attached) and ready to mail to you once we receive that receipt.  I have enclosed another copy of the Final Release and Receipt for you to sign and mail back to us.

---

[2] Dr. Laurie Flint.

Check No. 1038 drawn on the Williams Estate account signed by Respondent as "Ex WAW" in the amount of $45,000 to Dr. Laurie Fling, "Bequest from Will of Williams PAID IN FULL" is enclosed.

VSB Exhs. 2, 33; Testimony of Mark Kellogg and Dr. Laurie A. Flint.

47. By e-mail dated November 13, 2018, from Kellogg to John Galleher at UBS, Kellogg advised that "we have settled the case with the blood kin (those heirs of the estate that have/had standing to contest the Will). Accordingly we need for you to create an account in Robert B. Machen and Dorothy D. Machen's names as Tenants by the Entirety so that the remaining estate account assets may be transferred to it. The transfer needs to be old and cold before 12/31/2018. Please send me the paperwork that needs to be completed to accomplish this action."

VSB Exh. 54; Testimony of Mark Kellogg and John Galleher.

48. By e-mail dated November 19, from Kellogg to John Galleher, Kellogg attached worksheets for Respondent and his wife to open their new UBS account, held as tenants by the entirety, and funded with the Estate funds.

VSB Exh. 55; Testimony of Mark Kellogg and John Galleher.

49. By letter that same day, November 19, 2018, Mark Obenshain, counsel for David Harold Williams, one of the recipients of the October 15, 2018, letter, requested that Kellogg advise whether Respondent drafted the Probated Will and whether Williams was administered any mental status examination at the time of her execution of the Probated Will. Mr. Obenshain also requested the following:

- A full inventory of the assets of the Estate.
- A copy of any and all wills executed by Williams prior to the Probated Will.
- Mr. Williams's wills, as referenced in the Probated Will.
- Identification of the notary public who notarized the Probated Will.
- Any POA appointing Respondent as Williams's attorney-in-fact.
- Medical record release for Williams's medical records.

Stipulations ¶ 32; VSB Exhs. 2, 34; Testimony of Mark Obenshain and Mark Kellogg.

50. By letter dated November 29, 2018, Kellogg responded:

The Executor has made the decision to respond to those of your requests to which he has a legal obligation to respond and will not respond to any of your requests for information to which your client has no legally enforceable right. Stated simply, we are not going to allow you to fish about in this case pre-filing to see if

11

you have a cause of action."

"The most money that David could ever have the right to based on the facts that can be established is the $30,000 given him in the probated Will."

"We are willing to pay him that amount before the first anniversary date of death, but only if he signs the release and receipt that makes clear he has no further rights in and to the estate. David is the only alleged relative who has not already sent back the release, been paid and the check honored by the Estate's bank.

VSB Exhs. 2, 34; Testimony of Mark Obenshain and Mark Kellogg.

51. Enclosed in the November 29 letter, and referenced for the first time, was a purported "holographic" will which Respondent maintained Williams prepared in July 2018 after Williams was hospitalized for her stroke:

The second document is a copy of the only other known signed will ... a holographic Will written up and signed by Wilma without the Executor's presence or participation in its drafting while she was in the post hospitalization rehabilitation clinic. We are suppling [sic] this to you to fully establish the known limits for what your client might be entitled as that, in turn, establishes the limits on his standing to contest the Will. As you can see, it is rather rough, but does clearly leave Machen the rest and residue. It does leave nieces and nephews as a group $10,000 to be divided among them. $1,111.11 would be David's share. Under Sec. 64.2-200.5. [sic] Wilma's intestate share would pass to her relatives and their descendants. David is not a descendant of Wilma, he is only a descendant of Daniel.

VSB Exhs. 2, 34; Testimony of Mark Kellogg and Mark Obenshain. Evidence re: forgery includes VSB Exhs. 34, 37-45, 110; Testimony of Melinda Rossano, Leonard Rainey, Dr. Laurie A. Flint, Ronald Fitzgerald, and John Hargett.

52. In their November 29 letter Respondent and Kellogg also enclosed the 2017 POA, which was not the recorded version by which Respondent struck the requirement that Williams be incapacitated for him to act as her attorney-in-fact. VSB Exh. 34; Testimony of Mark Kellogg.

53. In reliance on the correspondence above, which falsely threatened that the beneficiaries who complained about the administration of the Estate would get nothing, all the beneficiaries except David Harold Williams executed the Releases. VSB Exhs. 2, 28, 29, 31, 36, 72-73, 76-78; Testimony of Melinda Rossano and Leonard Rainey.

54. Respondent did not disclose to the beneficiaries that Respondent drafted the will, that he named himself the primary beneficiary, that he had a conflict of interest, that he named his son as a contingent beneficiary, and that the Probated Will was not

executed in the presence of two witnesses. VSB Exhs. 2, 4, 28, 29, 31, 34-36, 72, 73, 77, 78; Testimony of Mark Kellogg, Mark Obenshain, David Harold Williams, Melinda Rossano, and Leonard Rainey.

55.   Respondent issued checks totaling $240,000 to 11 beneficiaries. VSB Exhs. 36, 56; Testimony of Mark Kellogg.

56.   By letter dated December 3, 2018, UBS placed a temporary hold on the disbursement of funds and securities from the Estate Account pending its review of whether Machen had financially exploited Williams. VSB Exh. 56; Testimony of Mark Kellogg and John Galleher.

57.   By letter dated December 11, 2018, to counsel for UBS, Andrew W. Sidman, Esq., Kellogg, on Respondent's behalf, provided Sidman with the probate file, including Respondent's appointment as Executor, the probated will, the purported "holographic will", the signed releases and checks to the beneficiaries, and information on Respondent's legal representation of Williams. VSB Exh. 56; Testimony of Mark Kellogg and John Galleher.

58.   By letter dated December 27, 2018, Kellogg, on Respondent's behalf, requested a valuation of the Estate funds and asked how UBS was coming with its investigation against Respondent. VSB Exh. 57; Testimony of Mark Kellogg and John Galleher.

59.   By letter dated January 16, 2019, UBS advised that the hold remained in place. VSB Exh. 58; Testimony of Mark Kellogg and John Galleher.

## UBS PETITION

60.   On February 22, 2019, UBS filed a petition in Fairfax County Circuit Court based on concerns that Respondent had financially exploited Williams by drafting the Probated Will naming himself as Executor and primary beneficiary and concerns that the Probated Will was not properly witnessed. Through the petition UBS sought an order directing UBS to pay Williams's funds then in UBS's possession ($953,000 remaining after the $385,000 Respondent transferred, $240,000 of which was disbursed to the beneficiaries) to the Clerk of the Fairfax County Circuit Court. UBS placed a temporary hold on the account for the Williams Estate. VSB Exh. 61; Testimony of Mark Kellogg and John Galleher.

61.   Four days later, on February 26, 2019, Kellogg, on behalf of Respondent, filed a complaint with the Financial Industry Regulation Authority (FINRA) because of the freeze which "will have lasted three full months on March 5, 2019, and has and will subject The Estate's assets to a **substantial market risk** without Machen's having any ability to change its investments or otherwise deal with them." The letter, signed by Respondent, stated as follows: "Machen wants to alter the investments to ones of long-term growth for his grandchildren's benefit out of the income producing

investments with interest rate exposure and no market potential." VSB Exhs. 59, 60; Testimony of Mark Kellogg and John Galleher.

62. By Order entered August 19, 2019, the Fairfax County Circuit Court granted UBS leave to sell all securities in Williams's account and deposit the funds with the Clerk of the Fairfax Circuit Court. VSB Exh. 62; Testimony of Mark Kellogg and John Galleher.

## CIVIL LITIGATION AND IMPEACHMENT OF THE PROBATED WILL WHICH JURY FOUND BY CLEAR AND CONVINCING EVIDENCE WAS PROCURED BY UNDUE INFLUENCE AND FRAUD

63. Legal proceedings ensued in Fairfax County Circuit Court, and the Probated Will was impeached, and Respondent's actions were nullified. During the proceedings, Respondent filed suit attempting to probate the other two originals of the Probated Will or the purported "holographic" will. Respondent non-suited his attempt to probate the "holographic" will at the close of his case-in-chief. Stipulations ¶¶ 33-39; Exh. 6 to Stipulations; VSB Exhs. 63-71.

64. Specifically, on February 25, 2019, David Harold Williams, a beneficiary named under the Probated Will and a nephew related by marriage to Williams, timely filed a complaint to impeach the Probated Will under Va. Code § 64.2-448. Nell Willis, his first cousin and Williams's niece, joined him in the suit (*David Harold Williams, et al. v. Robert B. Machen, et al.*, Case No. CL 2019-02656). The complaint alleged Respondent exerted undue influence and was engaged in fraud in connection with the preparation and execution of the Probated Will. Stipulations ¶ 33; Exh. 6 to Stipulations; VSB Exh. 63.

65. The complaint was amended on May 3, 2019. VSB Exh. 64.

66. Respondent filed Pleas in Bar to the Amended Complaint. The Pleas challenged the standing of David Williams and asserted a bar to Nell Willis based upon a release she executed. Stipulations ¶¶ 33-39; Exh. 6 to Stipulations; VSB Exhs. 63-71.

67. On August 9, 2019, Respondent filed a Complaint to admit to probate one of the two versions of the July 31, 2018, will not submitted to probate or the purported "holographic" will in the event the Probated Will was successfully impeached (*Robert B. Machen, et al. v. Leonard Guy Rainey, et. al.*, Case No. CL 2019-11031). Stipulations ¶ 34; Exh. 6 to Stipulations; VSB Exh.65.

68. The matters were consolidated for trial. Stipulations ¶¶ 33-39; Exh. 6 to Stipulations; VSB Exh. 66.

69. By Order dated November 27, 2019, the Court denied Respondent's Pleas in Bar to David Williams and Nell Wills. The Order permitted Respondent to argue the

affirmative defense of accord and satisfaction and provided that the issue of whether the Release was sufficient to constitute accord and satisfaction was to be determined by the Court. Specifically, Respondent claimed that Nell Willis had released claims against the Estate and him, individually and as Executor of Williams's Estate, because Willis executed the Release sent to her October 15, 2018, and received $30,000. Stipulations ¶¶ 33-39; Exh. 6 to Stipulations; VSB Exhs. 67, 69.

70. A jury was properly impaneled on December 2, 2019, to determine if any of the documents Respondent offered were Williams's Last Will and Testament. Stipulations ¶¶ 33-39; VSB Exh. 69.

71. In December 2019, a four-day jury trial was held on the consolidated cases. Stipulations ¶¶ 33-39; Exh. 6 to Stipulations; VSB Exh. 68.

72. The parties agreed on the burden of proof: Respondent had the burden of proving by the greater weight of the evidence that any of the three wills purportedly executed on July 31, 2018, were Williams's will. Stipulations ¶¶ 33-39; Exh. 6 to Stipulations; VSB Exh. 68.

73. David Williams and Nell Willis bore the higher standard of proof by clear and convincing evidence to prove the documents purporting to be Williams's will were procured by undue influence and fraud. Stipulations ¶¶ 33-39; Exh. 6 to Stipulations; VSB Exh. 68.

74. On December 4, 2019, at the conclusion of Respondent's case-in-chief, Respondent non-suited his claim to probate, as alternative relief, the document that he claimed was Williams's "holographic" will. Stipulations ¶¶ 33-39; VSB Exh. 69.

### JURY VERDICT, LETTER OPINION, AND FINDINGS BY CLEAR AND CONVINCING EVIDENCE

75. After listening to evidence for four days and deliberating on December 5, the jury returned its verdict on December 6, 2019. The jury found, by the greater weight of the evidence, that none of the writings dated July 31, 2018, were Williams's Last Will and Testament, and none of the documents were properly executed under Va. Code § 64.2-403(A) and (C). Stipulations ¶¶ 33-39; Exh. 6 to Stipulations; VSB Exhs. 68-69.

76. The jury also found, by clear and convincing evidence, that the July 31, 2018, documents had been procured by undue influence and fraud. Stipulations ¶¶ 33-39; Exh. 6 to Stipulations; VSB Exh. 68.

77. The jury further found that the undue influence and fraud included the recording of a false POA in 2018, the false and threatening letter sent October 15, 2018, and a release that contained falsehoods. Stipulations ¶¶ 33-39; Exh. 6 to Stipulations; VSB Exh. 68.

78.  After the jury made its findings, the Fairfax Circuit Court denied the defense of accord and satisfaction and set aside the release procured by Respondent in October 2018.  The Court held the Release was unenforceable because it was the byproduct and tool of a fraudulent scheme and lacked the necessary consideration for an enforceable instrument.  The Court wrote that the Release could not be raised as a defense in the suit or elsewhere.  Letter Opinion, p. 10.  Stipulations ¶¶ 33-39; Exh. 6 to Stipulations; VSB Exh. 68.

79.  By Order and Supplemental Order entered January 3, 2020, the Fairfax Circuit Court:

- vacated the document admitting the Probated Will;
- affirmed the jury's verdict that none of the writings dated July 31, 2018, were the last will and testament of Wilma Williams;
- refused admission of any of the three 2018 wills to probate;
- removed Respondent as Executor pending approval by the Commissioner of Accounts of Respondent's final accounting; and
- appointed a Curator to oversee Williams's Estate until the appointment of an Administrator.

VSB Exhs. 69-70; Testimony of Jennifer Baumgartner.

80.  Respondent appealed to the Supreme Court of Virginia.  By Order entered May 27, 2021, the Supreme Court of Virginia affirmed the judgment invalidating the will. The Supreme Court of Virginia denied a petition for rehearing of its Order affirming the judgment.  Stipulation ¶ 40; VSB Exh. 92.

81.  After being removed as Executor, Respondent failed to report to the curator regarding personal property belonging to the Estate and to reimburse the curator for the sale of personal property from the Estate, until the VSB investigator raised it to Respondent's attention during the bar investigation.  VSB Exhs. 25, 83, 112; Testimony of Ronald H. McCall and Jennifer Baumgartner.

82.  The curator further established that Respondent transferred title to Williams's home to himself in February 2019 and did not transfer title back to the curator until November 2020.  VSB Exhs 102, 106; Testimony of Jennifer Baumgartner.  Ms. Baumgartner further testified that Respondent did not return money and property until the Commissioner of Accounts issued a notice of hearing in July 2020.  VSB Exh. 104.  Thereafter, Respondent returned to Ms. Baumgartner: $48,565.60 in savings bonds, $43,701.60 in cash from the Armed Forces Bank, travelers checks, and personal property and shotguns.  VSB Exh. 106; Testimony of Jennifer Baumgartner.

## NATURE OF MISCONDUCT

Upon consideration of the witnesses' testimony, the exhibits, and arguments of counsel, the Court finds that such conduct by Respondent constitutes misconduct in violation of the following provisions of the Rules of Professional Conduct:

*Respondent violated Rule 1.8(c) by naming himself the primary beneficiary of Wilma Williams's Estate in the Probated Will and the other purported originals of the July 2018 Will, which Respondent drafted and by which he left over $1 million of Wilma Williams's Estate to himself.*

*Respondent violated Rule 1.8(c) by naming his son Mark Machen as a contingent beneficiary.*

**RULE 1.8     Conflict of Interest: Prohibited Transactions**

(c) A lawyer shall not solicit, for himself or a person related to the lawyer, any substantial gift from a client including a testamentary gift. A lawyer shall not accept any such gift if solicited at his request by a third party. A lawyer shall not prepare an instrument giving the lawyer or a person related to the lawyer any substantial gift from a client, including a testamentary gift, unless the lawyer or other recipient of the gift is related to the client. For purposes of this paragraph, a person related to a lawyer includes a spouse, child, grandchild, parent, or other relative or individual with whom the lawyer or the client maintains a close, familial relationship.

*Respondent violated Rule 3.1 by suing to enforce a fraudulent holographic will. Respondent violated Rule 3.1 by asserting the Release as an affirmative defense to Nell Willis's suit to impeach the Probated Will.*

**RULE 3.1     Meritorious Claims And Contentions**

A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law. A lawyer for the defendant in a criminal proceeding, or the respondent in a proceeding that could result in incarceration, may nevertheless so defend the proceeding as to require that every element of the case be established.

*Respondent violated Rule 3.3(a)(1) and 3.3(a)(4) by suing to enforce a fraudulent holographic will.*

*Respondent violated Rule 3.3(a)(1) by offering false testimony regarding the 2018 wills, the Probated Will, and the POA.*

*Respondent violated Rule 3.3(a)(4) by offering the 2018 Wills and POA to the Fairfax*

17

*County Circuit Court.*

**RULE 3.3    Candor Toward The Tribunal**

(a) A lawyer shall not knowingly:
   (1) make a false statement of fact or law to a tribunal;

   or

   (4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures.

*Respondent violated Rule 8.4(a)-(c) by engaging in a fraudulent scheme which began in July 2018 and continued through the civil will contest proceedings and which included the following:*

1.   *Procuring or attempting to procure the 2018 wills, including the Probated Will, through undue influence and fraud, including drafting and orchestrating the execution of the Probated Will and the other purported wills ten days before Williams's death and leaving himself the bulk of Wilma Williams's Estate.*

2.   *Misrepresenting that the Probated Will and the other wills were executed by Williams when they were not.*

3.   *Admitting a forged will or a will executed when Williams did not have the capacity to execute the same to probate.*

4.   *Misrepresenting that the Probated Will, and the other wills, were executed in the presence of two witnesses.*

5.   *Forging the "holographic" will.*

6.   *Recording an altered POA.*

7.   *Sending the October 15, 2018, letter and purported releases to induce and coerce the beneficiaries to release any claim they may have against Wilma Williams's Estate.*

8.   *Authorizing misrepresentations in the October 15, 2018, letter and false threats that if a beneficiary contested the Probated Will, they would get nothing.*

9.   *Discouraging beneficiaries from interfering with Respondent's scheme to take the bulk of Wilma Williams's Estate.*

10.  *Omitting, in the October 15, 2018, letter or otherwise, that Respondent drafted the Probated Will, that he named himself the primary beneficiary,*

*and that Respondent had a conflict of interest.*

11. *Omitting, in the October 15, 2018, letter, or otherwise, that Respondent's son was a beneficiary.*

12. *Omitting that the Probated Will was not executed in the presence of two witnesses.*

13. *Sending the November 29, 2018, letter to counsel for David Harold Williams, along with the enclosures, to induce Williams to execute the release and to forego any will contest.*

   *And*

14. *Failing to timely provide a copy of the Probated Will to the beneficiaries.*

**RULE 8.4   Misconduct**

   It is professional misconduct for a lawyer to:
   (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

   (b) commit a criminal or deliberately wrongful act that reflects adversely on the lawyer's honesty, trustworthiness or fitness to practice law;

   (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation which reflects adversely on the lawyer's fitness to practice law;

<u>Sanctions Phase</u>

   The Court then proceeded to the sanctions phase of the proceeding. The VSB and Respondent presented opening statements.

   The Court received the testimony of VSB witness Phillip Jay Hirschkop. The Court also received VSB Exhibit 113, Respondent's disciplinary history; VSB Exhibit 114, a criminal show cause and indictment against Respondent; VSB Exhibit 115, the certification at issue in the 1993 public reprimand against Respondent; and VSB Exhibit 116, a copy teste of the United States District Court Criminal Docket in *US v. Machen*, filed 9/9/87, Docket No. 87-00234. The VSB rested after presentation of this evidence.

   The Court received testimony of the following witnesses for Respondent: Robert

19

B. Machen through testimony and proffer; Steve Armstrong, Esq., through proffer; and Lucinda McMichael, through proffer. The Court also received Respondent's Exhibit B, already in evidence as a portion of VSB Exh. 15, VSB Exh. 338-00318, and Respondent's Exhibit C, consisting of four pages, one page of a brochure, "Missing POWS-MIAS," and three pages in evidence as VSB Exh. 37, VSB Exh. 338-00533 and VSB Exh. 338338-0534 and VSB Exh. 338-00318, also Respondent's Exhibit B. Respondent rested after presentation of this evidence.

Counsel for the VSB and the Respondent presented argument regarding the sanctions to be imposed on Respondent for the misconduct found, and the Court recessed to deliberate.

<u>Determination</u>

After due consideration of the evidence as to mitigation and aggravation and argument of counsel, the Court reconvened to announce its sanction of Revocation of Respondent's license, effective February 18, 2022.

Accordingly, it is hereby ORDERED that Respondent receive a Revocation of his license to practice law in the Commonwealth of Virginia, effective on February 18, 2022.

It is further ORDERED that Respondent must comply with the requirements of Part Six, Section IV, Paragraph 13-29 of the Rules of the Supreme Court of Virginia. Respondent shall forthwith give notice by certified mail, return receipt requested, of the Revocation of his license to practice law in the Commonwealth of Virginia, to all clients for whom he is currently handling matters and to all opposing attorneys and presiding judges in pending litigation. Respondent shall also make appropriate arrangements for the disposition of matters then in his care in conformity with the wishes of his clients.

20

Respondent shall give such notice immediately and in no event later than 14 days of the effective date of the revocation, and make such arrangements as are required herein as soon as practicable and in no event later than 45 days of the effective date of the Revocation. Respondent shall also furnish proof to the VSB within 60 days of the effective date of the Revocation that such notices have been timely given and such arrangements made for the disposition of matters.

It is further ORDERED that if Respondent is not handling any client matters on the effective date of the Revocation, he shall submit an affidavit to that effect to the Clerk of the Disciplinary System of the VSB. All issues concerning the adequacy of the notice and arrangements required by Paragraph 13-29 shall be determined by the VSB Disciplinary Board.

It is further ORDERED that the Clerk shall send a copy teste of this Memorandum Order to Respondent, Robert B. Machen, by certified mail, return receipt requested, to #1014, 1101 South Arlington Ridge Road, Arlington, VA 22202-1929, his address of record with the VSB; to the Honorable DaVida M. Davis, Clerk of the Disciplinary System, Virginia State Bar, 1111 E. Main Street, Suite 700, Richmond, VA 23219; to Respondent's Co-counsel Stephen Andrew Armstrong, P. O. Box 29100, Henrico, VA 23242, and Allen Huberth Sachsel, Suite 307, 10521 Judicial Drive, Fairfax, VA 22030; and to Renu M. Brennan, Bar Counsel, Virginia State Bar, 1111 E. Main Street, Suite 700, Richmond, VA 23219.

The hearing was recorded by Thomas Watson, Anderson Court Reporting, LLC,

1800 Diagonal Road, Suite 600, Alexandria, VA 22314, telephone 703-519-7180.

ENTERED: 4 March 2022

The Honorable Douglas L. Fleming, Jr.
Chief Judge

The Honorable Victoria A. B. Willis

The Honorable Steven S. Smith   By: Douglas L. Fleming, Jr.
with Authority

I ask for this:

VIRGINIA STATE BAR

By: _Rule 1:13_

Renu M. Brennan, Bar Counsel
VSB No. 44529
Virginia State Bar
1111 East Main Street, Suite 700
Richmond, VA 23219-3565
(804) 775-0575
brennan@vsb.org

SEEN AND _____ :

By: _Rule 1:13_

Stephen A. Armstrong, Co-Counsel for Respondent
VSB No. 16500
P. O. Box 29100
Henrico, VA 23242
(408) 644-0911
armstrong16500@gmail.com

By: _Rule 1:13_

Allen H. Sachsel, Co-Counsel for Respondent
VSB No. 65896
#307, 10521 Judicial Drive
Fairfax, VA 22030-5160
(703) 385-9400
ahs-in@hotmail.com

22

RHM

12/17/19



# NINETEENTH JUDICIAL CIRCUIT OF VIRGINIA

**Fairfax County Courthouse**
**4110 Chain Bridge Road**
**Fairfax, Virginia 22030-4009**

703-246-2221 • Fax: 703-246-5495 • TDD: 703-352-4139

COUNTY OF FAIRFAX          CITY OF FAIRFAX

VSB
EXHIBIT
B

BRUCE D. WHITE, CHIEF JUDGE
RANDY I. BELLOWS
ROBERT J. SMITH
BRETT A. KASSABIAN
MICHAEL F. DEVINE
JOHN M. TRAN
GRACE BURKE CARROLL
DANIEL E. ORTIZ
PENNEY S. AZCARATE
STEPHEN C. SHANNON
THOMAS P. MANN
RICHARD E. GARDINER
DAVID BERNHARD
DAVID A. OBLON
DONTAÈ L. BUGG

JUDGES

THOMAS A. FORTKORT
J. HOWE BROWN
F. BRUCE BACH
M. LANGHORNE KEITH
ARTHUR B. VIEREGG
KATHLEEN H. MACKAY
ROBERT W. WOOLDRIDGE, JR.
MICHAEL P. McWEENY
GAYLORD L. FINCH, JR.
STANLEY P. KLEIN
LESLIE M. ALDEN
MARCUS D. WILLIAMS
JONATHAN C. THACHER
CHARLES J. MAXFIELD
DENNIS J. SMITH
LORRAINE NORDLUND
DAVID S. SCHELL
JAN L. BRODIE

RETIRED JUDGES

December 16, 2019

By e-mail: mdo@obenshainlaw.com;
jmw@obenshainlaw.com

Mark D. Obershain, Esq.
Justin M. Wolcott, Esq.
**OBENSHAIN LAW GROUP**
420 Neff Avenue, Suite 130
Harrisonburg, Virginia 22801

By e-mail: gpeterson@petersonsaylor.com
tsaylor@petersonsaylor.com

George O. Peterson, Esq.
Tania Saylor, Esq.
Peterson Saylor, PLC
10484 Armstrong Street
Fairfax, Virginia 22030-3306

Re:  *David Harold Williams et. al. v. Robert B. Machen, et. al.,* Case No. CL 2019-02656
     *Robert B. Machen et. al. v. Leonard Guy Rainey, et. al.,* Case No. CL 2019-11031

Dear Counsel,

This letter addresses the issue of accord and satisfaction the Court kept under advisement pending the jury's verdict on the Will contest between the parties – *devisavit vel non.* Specifically, one of the Plaintiffs in this consolidated action, Nell Willis, had executed a release of claims against the Defendant Robert B. Machen, individually and as Executor of the Estate of Wilma R. Williams, his attorney, and the Estate itself. In return for executing the release, she received $30,000 as an early distribution and has since retained those funds. The Defendant raised, as a plea in bar and received by the Court as an affirmative defense, the claim of accord and satisfaction and release.

The Court reserved ruling on the issue of accord and satisfaction and release because a necessary component of an enforceable release is that it derives from a valid authority to enter into the release and does not otherwise arise from a void instrument. A finding that the Will is invalid nullifies all actions taken by the Executor under that instrument, including the release.

## Background and Standards

In an uncommon procedural posture, this consolidated case presented overlapping issues to be decided at trial, including the request that the jury determine whether any of the documents produced on July 31, 2018 constituted the last Will and Testament of Wilma R. Williams.

A complaint to impeach a Will pursuant to Va. Code § 64.2-448(E) is heard and decided by a jury. The jury's verdict is generally binding. *Hartman v. Hartman*, 82 Va. 225 (1886); *Kirby v. Kirby*, 84 Va. 627 (1888). However, it is up to the Court to decide whether to admit a Will to probate. Va. Code § 64.2-448(E) provides:

> Upon the filing of a complaint to impeach or establish the will pursuant to this section, the court shall order a trial by jury to ascertain whether what was offered for probate is the will of the testator. The court may require all testamentary papers of the testator to be produced and direct the jury to ascertain whether any paper produced is the will of the testator. The Court shall decide whether to admit the will to probate.

The decedent, Wilma R. Williams, died on August 10, 2018. Ten days before she died, she purportedly signed three documents, dated July 31, 2018. The documents are purportedly three originals of her last Will and Testament. On August 17, 2018, seven days after her death, Defendant Robert Machen admitted to probate one of the July 31, 2018 documents and received an appointment as the Executor of the Estate of Wilma R. Williams.

The admission of a document to probate by the Clerk of the Court under Va. Code § 64.2-444 is an acknowledgement the document is testamentary in character and not subject to a demurrer or collateral attack. *First Church of Christ, Scientist v. Hutchings*, 209 Va. 158, 161 (1968). Under § 64.2-448 a party interested in the probate of a will may nonetheless file a complaint to impeach or establish a will admitted to probate within one (1) year of the Clerk's Order admitting the will. Despite having been admitted to probate, once the Will is challenged, the burden remains on the propounder of the Will to prove the due execution and competency of the testator, as though no probate had ever been granted. *Dickens v. Bonnewell*, 160 Va. 194, 206 (1933).

On February 25, 2018, David Harold Williams, a beneficiary named under the probated Will and a nephew related by marriage to Ms. Williams, timely filed a Complaint to impeach the Will under Va. Code § 64.2-448. He was joined by and his first cousin, Nell Willis, who is Ms. William's niece.

Later, on August 9, 2019, Mr. Machen timely filed a Complaint to establish one of three documents or a fourth document represented as a holographic will in the event Mr. Williams and

Ms. Willis succeeded in impeaching the one Will admitted to probate. At the conclusion of Mr. Machen's case-in-chief, he took a nonsuit of Count III that sought to admit, as an alternative relief, a document that he claimed was Ms. Williams' holographic Will. The three typewritten Wills remain at issue.

Prior to the case being presented to the jury, the parties agreed upon the order of presentation of the evidence and the burden of proof. The Court instructed the jury that Mr. Machen had the burden of proving by the greater weight of the evidence that any of the three documents was Wilma Williams' Will. The higher standard of proof of clear and convincing remained upon David Williams and Nell Willis to prove the documents purporting to be her Will were procured by undue influence and fraud.

At trial, the evidence failed to show by the greater weight of the evidence that the July 31, 2018 documents were properly executed as required under Va. Code § 64.2-403(A) and (C), More importantly, the evidence was overwhelming that the July 31, 2018 documents had been procured by undue influence and fraud. The jury's verdict is wholly consistent with the findings of this Court.

Upon the impeachment of the Will, the actions of the Executor are nullified because he lacks authority to dispose of the assets of the Estate or take any action with respect to the Estate, including obtaining releases. The release that is the subject of an accord and satisfaction defense is also unenforceable because it is the byproduct and tool of a fraudulent scheme and lacks the necessary consideration for an enforceable instrument.

The release is lastly not a bargain this Court would approve under Va. Code § 8.01-425. Although approval of the settlement of claims is permissive, such releases procured by the executor may be set aside, if the executor "did not act in good faith, with ordinary prudence and with due regard for the estate's interest". *Kelly v. R.S. Jones, Inc.*, 242 Va. 79, 84 (1991).

The Court finds here that the executor essentially self-appointed himself under an impeached Will and it is in the true Estate's interest to investigate where Wilma Williams' personal belongings have gone – especially those items moved out to a storage facility, to consider all claims against Mr. Machen, to recover the distributions that have been made without authority and to distribute the Estate as an intestate Estate.

### Summary of Material Facts

Wilma R. Williams was 93-years old when she died. In the years leading up to her death, she was known to be independent and private. From all accounts, wherever she went, she made friends and developed for herself a community of friends from her church group and neighborhood. Her relatives lived in Georgia, North Carolina, Texas and Nebraska. By the time of her death in 2018, she had lost her brother and sister, had no children of her own and was survived only by nephews and nieces.

Leading up to Ms. William's death, there were signs that she had health issues as she approached her 90's. By 2015, she had fallen, had to rely on meals on wheels and vacate her house

which was then overflowing with clutter. Her recovery, aided by Mr. Machen's involvement in having her return to her home, may have restored her in the eyes of her friends, neighbors and church associates, but it did not prevent her decline.

As convincing as the evidence was that Wilma Williams had capacity up to the 2018, the events of July 2018 produced a profound change and the evidence of the change far outweighed evidence to the contrary.

The downturn began with a call in the late evening to Dr. Laurie Flint – a neighbor and daughter of long-time friend. Dr. Flint testified that she was awakened by a garbled phone message sounding like Ms. Williams but retaining none of clarity or articulateness that Ms. Williams previously enjoyed.

An ambulance arrived at the scene and the first responders were able to gain access to her home. Ms. Williams moved from her house where she had lived for at least 45 years into the rehabilitation center known as "The Fairfax" near Ft. Belvoir in Fairfax, Virginia. During her stay, Ms. Williams stabilized but soon learned that she would not be returning home. Whether it was from realizing the catastrophic changes in her life or the effects of gradual deterioration, the overwhelming credible evidence was that by July 31, 2018, the date of the purported Will signing, Wilma R. Williams was a shadow of herself, confined to a wheelchair and reliant on a hearing enhancement device that looked like large headphones.

The fact that Ms. Williams died 10 days after she purported signed her Will is unfortunate but not surprising given the credible evidence provided by Dr. Flint, Ron Fitzgerald, her financial advisor, and Toni Foreman, a complete stranger and unwitting good Samaritan. These witnesses all provided an alarming appraisal of Ms. William's condition.

The credibility of witnesses is put at issue whenever they testify. There were generally three categories of witnesses who appeared before the Court in terms of their assessed credibility. There were witnesses such as Dr. Laurie Flint, whose earnest demeanor and clarity of thought and expression left the Court with no doubts that even when she had trouble recalling or when her testimony was imperfect, that it was evident Ms. Williams had been taken advantage of.

Mr. Machen argued that if Dr. Flint were to be believed, then it must be a proven fact that Wilma Williams trusted Mr. Machen. Dr. Flint's testimony had to be considered in context. It is not enough that she spoke softly when conceding that Wilma Williams had stated she "trusted" Bob Machen – but Dr. Flint added that Ms. Williams had warned her that Mr. Machen should be "watched." When weighed against the convincing manner in which Dr. Flint described the deteriorated appearance of her friend of many decades, there could be no doubt that the concerns voiced by Ron Fitzgerald echoed the doubts over Mr. Machen's trustworthiness and Ms. Williams growing suspicions of his involvement in her life. Since 2016, Mr. Machen had held a Power of Attorney and the keys to her home, not once making use of certain items. His actions quickened at the same time he came to learn of Ms. Williams' extensive investment holdings.

Both Ron Fitzgerald and Toni Foreman were convincing in the manner in which they presented their testimony. Their explanation of events was far more reasonable than that offered by witnesses called to support Mr. Machen.

In contrast to the three witnesses above, the credibility of the witnesses who spoke up in support of Mr. Machen's case fell far short of being persuasive. The notary appeared to be a witness inclined to say whatever she thought needed to be said, regardless of whether her testimony was true. The only certainty from her testimony is that she signed and affixed her notary seal, an act that can be described as more ministerial than substantive in this case.

William Bournes, the other witness who purportedly witnessed a proper execution of the Will by Wilma Williams, was afflicted as a self-described lifelong friend of Mr. Machen. Mr. Bournes failed to question the propriety of coming into the rehabilitation facility and surrounding a patient with virtual strangers to witness the signing of three Wills. Ms. Foreman's description of Mr. Machen and Mr. Bournes engaged in self-absorbed banter regarding their experiences in the military while Ms. Williams sat mute and detached was a much more credible description of the events of July 31, 2018 that that offered by Mr. Bournes.

Consequently, this was not a case where the jury focused on the wrong witness or a witness to a Will who suffers the lack of recall in the formalities of the execution of the Will as had occurred in *Martin v. Coleman*, 234 Va. 509, 512 (1987). This case presented an instance where the credibility of the supporting witnesses to the Will was so strained that even standing alone, they could not be believed and when weighed against the testimony of the other witness, offered no support to Mr. Machen's claims.

Although his claims were aided by medical records that recorded Ms. Williams as being "alert", the records were admitted without explanation and the weight afforded to them could not overcome the strength of evidence proving that Ms. Williams, on the day of the signing, lacked the capacity to understand the documents shown her and that it was probable that she signed the papers before the witnesses arrived in her room.

Ultimately, the silent witnesses – the circumstantial evidence of undue influence and fraud that did not need to explain themselves, left the Court with the unshakeable conclusion the 2018 documents were not signed by Wilma Williams or if she had affixed her scribbled signatures that she lacked the testamentary capacity to understand the extent of her assets, the scope of her affections and the consequences of the documents presented to her.

The several instances of circumstantial evidence of undue influence and fraud included but are not limited to the following:

- Mr. Machen's recording of a false power of attorney in July 2018[1] to be able to represent to Ron Fitzgerald that he had a power of attorney which would entitle him to obtain copies of Ms. Williams UBS Statements. His

---

[1] *Compare* Defendants' Exhibit #44A with Exhibit #44

taking the statements home and from which he discovered to his surprise that this elderly widow whose only asset appear to be a home in Fairfax (which was itself valuable) was actually a millionaire.

The recorded power of attorney was a false document because it was the same 2016 Power of Attorney that Wilma Williams in September of 2017 had written upon to note the resignation of Mark Machen, the son of Robert Machen, as alternative agent under the Power of Attorney. The 2018 recorded Power of Attorney did not have the strike-out and moreover, it contained an additional strike out of the provision that would have made the Power of Attorney operable only upon Ms. Williams' incapacity. *Compare* Defendant's Exhibit #44 with Exhibit #44A. The Court has no doubts that Wilma Williams did not strike out that sentence that removed the condition of her being incapacitated or initial the strikeouts in the recorded Power of Attorney, allowing Mr. Machen to act under the Power of attorney.

With the 2016 Power of Attorney so manipulated, Bob Machen placed himself in a position to exercise control of Ms. Williams UBS Account and all other assets.

- Bob Machen moved with an unnatural sense of urgency to obtain and probate Ms. Williams Will in July 2018[2]. In just 20 days after she had fallen and suffered a stroke, he had her execute a Will that for the past 93 years, she had not thought to do. If it were to be believed that Wilma Williams and no one else, and thought that she was in imminent danger of death, the question arises why it was so urgent for Mr. Machen to have her sign a Will on July 31, 2018. Having waited 93 years, she could have just as easily executed a Will after moving to an assisted living center where she had been heading in early August[3]. She could have certainly waited until after she consulted with her financial advisor.

  If it were true that Mr. Machen held a valid Power of Attorney and if he did not believe she was seriously ill and could live for years longer, there was no need to have her execute a document so important as her last Will and Testament in the sterile setting of the rehabilitation center.[4]

- Bob Machen sought and inexplicably failed to use an experienced lawyer to draft her Will. Mark Kellogg, Esq. - a lawyer with whom he had been friends for decades and who was available up to and including July 31, 2018

---

[2] *See* Defendants' Exhibits #1, #4 and #5 dated 07/31/18 as compared to Defendants' Exhibit 58, Admission record of 7/11/2018 for The Fairfax, bates number THEFAIRFAX 246.

[3] Defendants' Exhibit #16 (08/05/18 Application to BrightView Senior Living – Assisted Living Facility).

[4] Defendants' Exhibit # 18 – Photo of bed at The Fairfax.

*David Harold Williams et. al. v. Robert B. Machen, et. al.*, Case No. CL 2019-02656
*Robert B. Machen et. al. v. Leonard Guy Rainey, et. al.*, Case No. CL 2019-11031     6 | Page

to draft the Will was abundantly clear that he could have drafted the Will at any time before his planned European vacation on August 15, 2019. By sidestepping Mr. Kellogg, while asking for his help, it set up an easy excuse for Mr. Machen to claim that he sought out help from an impartial draftsman.

• A mere ten (10) days after Wilma R. Williams' death, Mr. Machen admitted the Will to probate and received his appointment as Executor. Within a short time after Mr. Kellogg's return from this extended European Vacation, Mr. Machen collaborated with his attorney to send out a Final Release and Receipt letter to all the beneficiaries named under the "Will" admitted to probate. Although Mr. Kellogg's presence was not sought in the drafting of and execution of the Will, his appearance does nothing more than lend an air of legitimacy to an illegitimate enterprise.

The haste with which both men acted is apparent from the cover letters sending the release to each of the identified distributee.[5]

There were two versions of the October 15, 2018 letter and both contain typos, some of which were repeated and others were not. The letter sent to Nell Willis starts off with the first word totally capitalized as in "AS" and contains other typos throughout.[6]

The form letter sent to nieces and nephews of Ms. Williams contained some of the same typos and used language that was curious for a legal notice. And

---

[5] The cover letter violates Rule 4.3 of the Virginia Rules of Professional Conduct. It contains legal advice, notifying the recipients that the Executor did not have to pay out distributions earlier than the one-year anniversary of his qualification and that the Will contained an enforceable *in terrorem* clause that is triggered by complaints over the administration of the Estate. Setting aside the accuracy of such representations, Rule 4.3 reminds lawyers who communicate with unrepresented parties that they are not to offer legal advice to an unrepresented party. Moreover, the letter is framed in a manner to suggest the Executor is acting against the advice of counsel, suggesting the attorney is actually disinterested, especially where the letter states that "[W]e have determined there are sufficient assets . . . and closes with "Thank you for . . . assisting us in this matter".

The letter defines the signatory as an attorney for the Estate, identifying for the non-represented addressee of the letter what appears to be three distinct entities – "The Decedent" – "The Estate" and "The Executor". It confers a false assurance of independent legal analysis because Robert Machen is identified in the Will as a lawyer – indeed Wilma Williams' trusted lawyer and friend - who presumably could have sent the same letter. The cover letter does not disclose that Mr. Machen drafted the Will. Although violations of the ethical rules will not give rise to a cause of action, an ethical lapse may be based upon concurrent facts that can affect the *bona fides* of a transaction, similar to actions taken with a clear conflict of interest.

[6] Plaintiffs' Exhibits #11 and #12.

---

*David Harold Williams et. al. v. Robert B. Machen, et. al.,* Case No. CL 2019-02656
*Robert B. Machen et. al. v. Leonard Guy Rainey, et. al.,* Case No. CL 2019-11031          7 | Page

given the relatively small number of letters sent, it was suspicious the authors did not even bother to address them specifically to the recipient.

The cover letter was threatening and left Nell Willis and Leonard Rainey with the clear impression that they had no choice but to agree to the release.

The cover letter was false because it did not inform the recipients that the Will was not a valid Will.

The Release[7] itself contained untruths. It stated that the releasee had "confirmed" with her own independent counsel the need to sign the release. When the release was drafted, the author(s) had no idea that statement would be true. It was, however, apparent and known that Nell Willis did not consult with a lawyer. It would have been truthful for the release to state that the releasee had "an opportunity to consult with a lawyer." To purposely insert the statement that the person who signed the release actually consulted (or confirmed) with a lawyer is to prepare a document that will probably be false and is then afterwards actually known to be false when it is returned, known to be constructively false, or is a document whose falsity is allowed to be perpetrated by willful blindness.

- Mr. Machen's refusal to show Dr. Flint the document he had Wilma Williams sign under the poor excuse that "Dr. Flint" was in the document. It is more credible that if, in fact, Ms. Williams signed or scribbled on the documents that were eventually presented as her Wills, that Mr. Machen was simply concealing from Dr. Flint the fact that he had drafted a document in which he was ultimately the largest beneficiary.[8]

- Mr. Machen's rush in having the so-called Will witnessed by a lifelong friend and a stranger rather than any other of the number of visitors who purportedly visited Ms. Williams. Mr. Machen could have called upon any number of friends or acquaintances that he brought to testify. He could have called on Ron Fitzgerald who had been Ms. Williams' financial advisor for years. He chose instead to rely on a friend, a young notary and a stranger.[9]

- Mr. Machen's inclusion of his son Mark Machen as a contingent beneficiary in a document purported to be Ms. Williams' last Will and Testament.[10]

---

[7] Defendants' Exhibit#19.

[8] Credible and persuasive testimony of Dr. Flint.

[9] Testimony of Ron Fitzgerald, William Bourne, Rev. Joseph Acanfara, Raffie Shahrigran, Tina Connor, Pad Wade, and Marilyn Henretty.

[10] Defendants' Exhibits #1 at MACHEN01016 and MACHEN1017.

- The noticeable difference in the July 31, 2018 Will compared to the written drafts known to be prepared by Wilma Williams in which she could not decide how to distribute her assets. The sudden inclusion of the no-contest clause with the draft separately written in a handwriting that does not appear to belong to Ms. Williams.[11]

- The errors in identifying surviving family members in the so-called holographic Will, suggesting it was not the product of Ms. Williams' thoughts or intentions.[12]

- The July 31, 2018 explanation of why Robert Machen was named as a beneficiary reads more like an opening statement a lawyer would make arguing his case than what a layperson would have written in disposing of her property.

- Mr. Machen's assertion of control over the UBS financial statements that revealed that Ms. Williams had over a million dollars in investments. The shielding off of Ron Fitzgerald and demands made upon Mr. Fitzgerald to send the statements over to Mr. Machen's address in the absence of any evidence suggesting that Wilma Williams had been consulted and approved of the address change supports the claims of undue influence.[13]

As the evidence in this case unfolded and while the jury was deliberating, the Court had to consider the possibility that the jury's verdict would be inconsistent with the weight of the evidence. Fortunately, that inconsistency did not occur.

### Additional Legal Analysis

A document found not to be the last Will and Testament of the decedent and a document that is found to be the product of fraud and undue influence is a void instrument if timely impeached. As a void instrument, it never creates an Estate and any Executors named under the invalidated document cannot assume the authority provided to executors of a decedent's estate. As long ago as 1844, the Virginia Supreme Court recognized that when a Will is invalid, such as, for example a Will written by an insane person, then the executor ". . . if he disposes of property under the will in a manner different from what would be the proper distribution of its, when the will is set aside, as if he paid a legacy, the payment cannot be valid." *Coalter's Ex'r v. Bryan,* 42 Va. 18, 1844 Va. LEXIS 17, 88-90 (1844).

---

[11] *Compare* Defendants' Exhibits #1, #4 and #5 with Defendants' Exhibit #3 and #7 (and Plaintiffs' Exhibit #27.

[12] Defendants' Exhibit #3.)

[13] Credible and persuasive testimony of Ron Fitzgerald.

*David Harold Williams et. al. v. Robert B. Machen, et. al.,* Case No. CL 2019-02656
*Robert B. Machen et. al. v. Leonard Guy Rainey, et. al.,* Case No. CL 2019-11031          9 | Page

In the *Coalter* case it was noted that even if an Executor did not have notice that Will was invalid and the property he held could not be distributed, that the Executor could still be held responsible to the true owner of the property.

Assuming, but not concluding, that consideration[14] existed in the first place for the release, whatever consideration may have existed failed because except for bona fide purchasers for value, the distributees will have to return the disbursements made by Mr. Machen. Some of the distributes are not entitled to receive a distribution from the estate and are technically holding stolen funds.

The failure of consideration can nullify a release or any contract. *See, Planters Nat. Bank of Federicksburg v. E.G. Heflin Co.*, 166 Va. 166 (1936); *Neely v. White*, 177 Va. 358, 366-67 (1941) *superseded on other grounds by statue, Cummings v. Fulghum*, 261 Va. 73 (2001). Given that the distributes may be required to return the monies they received, their consideration for the release has failed.

Moreover, the release is a fraud upon the heirs at law of the intestate estate. Releases may be rescinded for fraud in its procurement. *Nationwide Mut. Ins. Co. v. Martin*, 211 Va. 354, 357-58 (1968). Generally, adversaries in litigated or disputed proceedings cannot reasonably rely on representations made by their opponents during settlement or compromise negotiations . *Jared and Donna Murayama 1997 Trust v. NISC Holdings, LLC*, 284 Va. 234, 248 (2012) *citing Facebook, Inc. v. Pacific Nw. Software, Inc.* 640 F.3d 1034, 1039 (9th Cir. 2011). That same adversarial relationship, however, does not exist between a named distributee under a Will and an Executor who appears to be working on behalf of the distributee over the advice of counsel for the Estate. To the lay person, it is reasonable to perceive that the Executor or the attorney for the Estate, either or both, represent the interest of the lawful beneficiaries of the Estates.

Ultimately, however, the facts of this case more closely resemble *Carter v. Williams*, 246 Va. 53 (1993) than *Parson v. Miller*, 296 Va. 509 (2018). The failure of consideration and the fraud in the procurement of the release renders the release executed by Nell Willis unenforceable and offers no opportunity for Mr. Machen to raise it as a defense here or elsewhere.

## Conclusion

The July 31, 2018 document is not Wilma R. Williams last Will and Testament. None of the other documents are her Will. At present, Ms. Williams has left behind an Intestate Estate and

---

[14] The amount of consideration is less than a peppercorn where an Executor obtains a release by paying out to distributees sums that they are already entitled to receive and the assets in the estate far exceeds its liabilities. Although as Mr. Machen had argued in his plea-in-bar, a peppercorn is all that is usually needed, some consideration may fall short of even a peppercorn such that the conveyance can only be construed as a gift. *See, Streddo. v. Streddo*, 59 Va. App. 471, 488-89 (2012) *citing Hockett v. Emmett*, 215 Va. 726, 729 (1975).

consequently, the Court will enter a final Order confirming the jury's verdict and declining to admit any of the documents to probate.

The Court asks Mr. Obenshain to prepare and circulate a Final Order that confirms the jury's verdict and final Order adopting and incorporating this letter opinion as it addresses the issue of the Nonsuit, and then the accord and satisfaction. The parties should advise the Court whether there are any other outstanding issues to be addressed before the Court enters a Final Order.

This matter had been continued to **Thursday, December 19, 2019 at 9:30 a.m.** The parties may ask that the hearing be moved to a more convenient date by reaching out to the Court's law clerk. If the parties are unavailable on Friday – 01/03/2020 at 9:30 a.m. or 01/17, the Court will schedule a 9:30 a.m. hearing on other days the courthouse is open.

Thank you.

Sincerely,

John M. Tran
Judge, Fairfax Circuit Court

*David Harold Williams et. al. v. Robert B. Machen, et. al.,* Case No. CL 2019-02656
*Robert B. Machen et. al. v. Leonard Guy Rainey, et. al.,* Case No. CL 2019-11031    11 | Page